UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

CRIMINAL ACTION

VERSUS

NO. 17-0024-JJB-EWD

JORDAN SERGENT

## RULING

This matter is before the Court on a Motion to Suppress (Doc. 42) brought by the Defendant, Jordan Sergent ("Sergent"). The Government filed an Opposition (Doc. 46). An evidentiary hearing was held on the Motion on May 22, 2017. Both parties submitted post hearing memoranda (Docs. 58 and 59) and replies thereto (Docs. 60 and 61). For the reasons stated below, the Defendant's Motion is **GRANTED**.

## I. FACTUAL FINDINGS[1]

Baton Rouge police officers entered Sergent's mobile home, searched all of the rooms, searched a hunting case in one of the rooms, and located a homemade explosive device, all without a warrant. The officers decided to search the home citing safety concerns, even after all of the individuals who were in the home cooperated with officers, exited the home, and had been briefly detained.

As a result of this warrantless entry and subsequent search and seizure of evidence from his mobile home, Sergent was charged with two counts of Possession of an Unregistered Destructive Device in violation of 26 U.S.C. §§ 5861 (d) and 5871.[2] The devices that form the

---

[1] The Court describes the credible evidence that was introduced at the hearing. "The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts. At a suppression hearing, it is 'well within the trial court's discretion' to weigh the evidence and make credibility determinations regarding conflicting testimony." *United States v. Jones*, 187 F.Supp.3d 714, 723 (M.D. La. 2016) (citing *Norman v. Stephens*, No. H–13–0624, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013)).

[2] Doc. 17.

basis of this case were recovered from Sergent's hunting case.[3] Among hunting materials, including a knife, bags of rice, and some ammunition, officers located some pill bottles that had been wrapped in electrical tape and had fuses.[4]

## A. The Afternoon Altercation

The events that led to the search of Mr. Sergent's home began in the afternoon of February 1, 2017. Mr. Sergent had been staying at Darius Budgewater's ("Budgewater") home for a few days which was located in the Winchester Trailer Park.[5] Budgewater is the Defendant's brother.[6] Various security guards were working at the trailer park in February 2017.[7] Their job was to oversee the construction workers who were setting up FEMA trailers in the park.[8]

In the afternoon, Budgewater and Sergent got into an argument with Marsha Franklin ("Franklin"), a security guard who was monitoring the work site.[9] Franklin told another Officer, Officer Hanson ("Hanson"), that Budgewater and Sergent had been bothering her all day.[10] Apparently, they were mad about where Franklin was parked and why she was allegedly watching their house.[11]

Eventually, Hanson switched places with Franklin and took over monitoring the FEMA site near Budgewater's home.[12] Both Budgewater and Sergent left the home for a little while, and returned at around 1 PM.[13] Both Budgewater and Sergent went inside, and then Budgewater came

---

[3] Hearing Transcript, May 22, 2017, 151:3-19, Doc. 53 ("Tr.").
[4] *Id.*
[5] *Id.* at 191, 199.
[6] *Id.* at 191.
[7] *Id.* at 8.
[8] *Id.*
[9] *Id.* at 7.
[10] *Id.*
[11] *Id.* at 7-8.
[12] *Id.* at 9
[13] *Id.* at 9-10.

out of the house with a chair.[14] Budgewater continued to harass Hanson for a few hours.[15] At around shift change, Budgewater allegedly said to Hanson, "I'm not afraid of you," and "I have a house full of guns and I'm not afraid to use them."[16]

### B. The Police Arrive

At approximately 6 PM, Hanson decided to call the police. During the call, he told the police that he was calling because Budgewater had "been sitting outside in his front yard and intimidating [Hanson] all day…[and Budgewater] mentioned that he's got guns inside of his trailer."[17] At the hearing, Hanson admitted that he did not explicitly tell the police on any of his 911 calls that he had been threatened, assaulted, or that he feared for his life.[18] However, at the hearing, he stated that he called 911 because he thought his life, and the lives of the other security guards, was in danger because Budgewater had been acting aggressively and strangely for hours.[19] Hanson also did not mention that he suspected drug dealing or that he smelled marijuana coming from Budgewater's trailer.[20]

About six to eight marked Baton Rouge Police Department ("BRPD") vehicles responded to the call and arrived at the trailer park.[21] Sergeant Ken Camallo ("Camallo") was in charge of the group that arrived.[22] When they arrived at Budgewater's trailer, they saw Budgewater standing at the end of the driveway.[23] He was immediately detained.[24] Although Camallo was not certain

---

[14] *Id.* at 10.
[15] *Id.*
[16] *Id.*
[17] Gov.'s Tr. Ex. 2A.
[18] Tr. 18-20, Doc. 53.
[19] *Id.* at 11.
[20] *Id.* at 21.
[21] *Id.* at 85.
[22] *Id.* at 60.
[23] *Id.* at 36, 88.
[24] *Id.* at 88.

that Budgewater was the individual who had been fighting with the security guards, another officer "figured that was him just 'cause it looked like he was waiting on [the police]."[25]

Camallo testified that as he approached the driveway of Budgewater's trailer home, he "immediately noticed a strong odor of marijuana in the air," and he "observed evidence of narcotics usage and distribution scattered across the ground [like] empty bag corners."[26]

Camallo continued to walk up to the mobile home. The door to the home was open.[27] Through the open door, Camallo saw Sergent sitting on the sofa playing video games with a headset on.[28] He also saw what he believed to be the butt of a rifle leaning against the wall next to Sergent.[29] He later learned that this was a pellet gun.[30] He further testified that he observed the corner of a gallon size Ziploc bag that contained a substance consistent with marijuana and "marijuana gleanings" scattered on the coffee table.[31]

At this point, Camallo got Sergent's attention, identified himself as BRPD, and asked to speak with Sergent.[32] While the Government and the Defendant appear to substantially agree about the events that led to Sergent speaking with Camallo, they disagree about what followed immediately thereafter.

Camallo testified that after Sergent got up and made his way to the door, Nyia Palmer[33] ("Palmer"), a female inside the home, emerged carrying her baby.[34] Camallo stated that Sergent and Palmer then exited the house, and responded to his various questions by telling him that there

---

[25] *Id.* at 132.
[26] *Id.* at 36.
[27] *Id.* at 38.
[28] *Id.* at 40.
[29] *Id.*
[30] *Id.* at 49.
[31] *Id.* at 41.
[32] *Id.* at 43.
[33] Palmer and Budgewater have a son together.
[34] *Id* at 43.

were neither any weapons nor people in the trailer.[35] Additionally, Corporal Passman ("Passman") testified that he heard Sergent deny that there were other people in the home.[36] Camallo admitted that Sergent advised him that the gun leaning on the wall was a pellet gun.[37] Camallo testified that Sergent and Palmer exited the trailer, and he *mirandized* them.[38]

Camallo testified that he was concerned as to why both Sergent and Palmer said no one else was in the home when he could still see another individual moving inside the trailer.[39] Eventually, this individual, Keonta Palmer ("Keonta"), exited the trailer at the officers' request and was *mirandized*.[40] Camallo issued an initial report and a supplemental report for the events that occurred on February 1, 2017. Notably, neither report makes any mention of the fact that Sergent and Palmer lied to him about another individual being in the house.[41]

Sergent and Palmer refuted Camallo's version of what happened at the doorway. Sergent testified that he came to the door and responded to Camallo's questions truthfully.[42] He told Camallo that there were others in the house, that he had a rifle in his room, and that he had smoked marijuana earlier in the day.[43] Sergent testified that while he was speaking with Camallo, Palmer and Keonta were already walking down the hallway.[44] Palmer testified to the same facts as Sergent, and she also told the officer that her brother, Keonta, was in the house.[45] Palmer testified that the officers sought her consent to search, but she refused.[46] The officers instructed her to exit the

---

[35] *Id.* at 44.
[36] *Id.* at 135.
[37] *Id.* at 45.
[38] *Id.*
[39] *Id.* at 44.
[40] *Id.* at 51. Keonta is Nyia's brother.
[41] *Id.* at 98.
[42] *Id.* at 191-92.
[43] *Id.* at 191-94.
[44] *Id.* at 191-92.
[45] *Id.* at 180.
[46] *Id.* at 181-2.

trailer.[47] Palmer further testified that Camallo told her "he had probable cause [to search] because he smelled marijuana."[48]

### C. The Crowd Outside

Both the Defendant and the Government agree that by this point in the encounter, Sergent, Palmer (and her baby), and Keonta, had exited the trailer, were cooperating, were handcuffed, and were not a threat to officers.[49] Camallo testified that several people began to gather outside of the home as he was speaking with the residents.[50] A young man who was agitated tried to push his way into the trailer, and Camallo instructed him to wait by the road if he was not a resident.[51] Sergent helped Camallo calm the individual down, and he walked off toward the crowd.[52]

### D. The Search

After all of the individuals were instructed to exit the trailer, Camallo made the decision to enter the trailer, along with three or four other officers including Corporal Passman.[53] Camallo said he made the decision to conduct a protective sweep to see if there were any other individuals inside of the trailer.[54]

Camallo went to the front of the trailer and Passman went to the back of the trailer.[55] Camallo testified that he located a rifle and marijuana and cleared the other rooms in the front of the trailer.[56]

---

[47] *Id.* at 182.
[48] *Id.*
[49] *Id.* at 71, 91-95.
[50] *Id.* at 52.
[51] *Id.*
[52] *Id.* at 115.
[53] *Id.* at 60.
[54] *Id.*
[55] *Id.* at 60-66.
[56] *Id.* at 124.

As part of Passman's search, he went into one of the bedrooms and made sure no one was in there.[57] When he was searching this room, he did not have his gun drawn.[58] He found a bag of marijuana in this room and brought it to the living room.[59] Passman then made his way to the rear bedroom, the room in which he eventually found the explosive devices.[60]

The rear bedroom was connected to a bathroom.[61] This bedroom did not have a working light so the only light in the room came from the bathroom light.[62] Passman checked the bedroom, the bathroom, and a connecting closet.[63] He testified that at this point the protective sweep was done because he had not located any individuals.[64] However, he testified that there was an open gun/hunting case in the middle of the room, which he began to examine.[65] Sergent refuted this testimony and asserted that the hunting case was closed and located in the closet of the bedroom.[66]

Passman picked up an item in the case because he "had no idea" what it was.[67] He shook it, heard BBs inside, used his flashlight to get a better look (although his light was malfunctioning), and noticed that the top of the device had a fuse.[68] Passman thought this item might be an explosive, so he picked it up, along with four other devices he suspected of being explosives, and moved them into the kitchen.[69] Camallo testified that he thought the sweep took about ten to twenty minutes while Passman thought the sweep lasted about five minutes.[70]

---

[57] *Id.* at 144.
[58] *Id.*
[59] *Id.* at 144-45.
[60] *Id.* at 145.
[61] *Id.* at 166-67.
[62] *Id.*
[63] *Id* at 167.
[64] *Id.*
[65] *Id* at 167-8.
[66] *Id.* at 203.
[67] *Id.* at 147, 170.
[68] *Id.* at 172.
[69] *Id.*
[70] *Id.* at 124, 150.

## II.  DISCUSSION

The Defendant argues that the police action in this case was unconstitutional for three reasons. First, he argues that the warrantless entry into the mobile home was not justified by the exigent circumstances exception. Second, he argues that even if the entry was lawful, the protective sweep was unlawful because it was not a quick and limited search for people, but a full-blown search for contraband. Third, he argues that even if the entry and the sweep were lawful, the seizure of the explosive devices was unconstitutional as the incriminating nature of the item was not immediately apparent.

The search of Sergent's home, conducted without a warrant, is *per se* unreasonable.[71] In this case, the Government bears the burden of proving that the search was valid and that an exception to the warrant requirement exists.[72] The Government has failed to meet its burden in two primary ways. For the reasons explained below, the Court finds that the initial entry into the mobile home was unlawful. Additionally, the Court finds that the seizure of the devices was unlawful as their incriminating nature was not immediately apparent.

### A.  The Exigent Circumstances Exception

Although presumptively unreasonable, an officer's warrantless entry into a residence can survive constitutional scrutiny when the police have probable cause that a crime is being committed inside the home *and* there are exigent circumstances that necessitate a warrantless entry into the home.[73]

---

[71] *Arizona v. Gant*, 556 U.S. 332, 338 (2009).
[72] *United States v. Morales*, 171 F.3d 978, 982 (5th Cir. 1999).
[73] *United States v. Richard*, 994 F.2d 244, 247-8 (5th Cir. 1993).

### 1.    *Probable Cause*

The Defendant argues that the officers did not have probable cause to believe a crime was being committed inside the mobile home. The Defendant argues that the officers' statements that they either smelled or observed marijuana from their position outside the trailer are not credible for two primary reasons. First, the Defendant argues that the officers' should not be believed when they say they smelled marijuana because all of the marijuana seized from the trailer was packaged in Ziploc bags which would effectively be impossible to smell from outside the trailer. Second, the Defendant asserts that Camallo's statement that he could see the corner of a Ziploc bag of marijuana through the open door should not be believed because Camallo failed to mention the Ziploc bag in either narratives of his initial or supplemental reports.

The Court need not spend a great deal of time on this analysis since the police report contained two statements that evidenced that there was probable cause to search the trailer. In his supplemental report, Camallo mentioned that he could smell the odor of marijuana as he approached the trailer.[74] Additionally, he saw marijuana gleanings on the table near Sergent.[75] Based on these two facts, and without deciding whether there was a Ziploc bag in plain view, the Court finds that the officers had probable cause to believe a crime was being committed inside the mobile home.

### 2.    *Probable Cause as the Exclusive Justification*

Before turning to an exigency analysis, the Court first addresses a related issue. The Defendant asserts that the officers' testimony at the hearing definitively showed that they did not enter the house in search of another individual, but instead, they felt justified to search based on their observation of marijuana and what they believed to be a gun (which they later found out was

---

[74] Def.'s Tr. Ex. 3.
[75] *Id.*

a pellet gun) through the open door. The Defendant seems to suggest that Camallo's own words and actions show that he was entering based on probable cause rather than probable cause *and* exigent circumstances. The Defendant urges the Court to find that the observation of drugs and guns was the exclusive justification for entering the trailer, and, therefore, the Court need not conduct an exigency analysis.

In support of his argument, the Defendant points to testimony and evidence. Camallo noted at the hearing that he made the decision to enter the trailer.[76] When asked why he felt the entry was justified, Camallo stated that "a protective sweep was conducted based on the observations that we observed when we initially arrived, which was the marijuana gleanings on the coffee table, the baggie corner containing the same suspected marijuana by his right foot, and then the butt of a weapon that was protruding from the right, visible through the door."[77] Later in the hearing, he reiterated his reasons for re-entering: "Q…So you made a decision not to call and get a warrant but instead to enter the trailer without a warrant and do a protective sweep? A: Correct, based on the items that I observed in plain view as well as the odor that was observed."[78]

The Defendant directs the Court to the above-cited testimony to suggest that Camallo's decision to enter was effectively premised on the drugs he saw, which would merely give him probable cause: "Sgt. Camallo was clear that his reasons for conducting the protective sweep were based on his observations of drugs and guns. This justification is further confirmed by the written police narratives, which do not detail, let alone mention, the specific facts which would support a reasonable belief in officer safety. The officers are now using 'officer safety' as a pretext to justify the warrantless search."[79]

---

[76] Tr. 60, Doc. 53.
[77] *Id.* at 103.
[78] *Id.* at 111.
[79] Def.'s Br. 14-15, Doc. 58.

Neither the initial police report nor the supplemental report make any mention of the alleged lie about the number of people in the house, nor do they mention that the officers believed there were other individuals located in the home.[80] In the initial report, Camallo stated that the entry and sweep of the home was a "further search incident to arrest."[81] In his supplemental report, he called it a "protective sweep," but he made no mention of a lie or any suspicion that other individuals were inside the home.

Additionally, Nyia Palmer's testimony lends further support for Defendant's argument. When asked at the hearing whether she gave the officers consent to search the house, she stated that she did not.[82] Additionally, when asked about what happened after she refused consent to search, she said, "when I told [Camallo] no, *he was like he had probable cause because he smelled marijuana*, and I had DJ [the baby] so he was like he can come in. And I still told him no because I wasn't the owner of the trailer so he made [Sergent] go downstairs, he made [Keonta] come outside and me come outside."[83]

After considering the officers' testimony, the police reports, and Palmer's testimony, the Court believes that the Defendant's argument—that the officers were acting solely on probable cause rather than probable cause and exigent circumstances—is incredibly compelling. The Defendant urges the Court to effectively ignore the alleged lie, rely on the above-cited material, and find that the officers entered the trailer solely because they observed guns and drugs, and not because they thought other individuals were hiding inside. If the Court were to accept this argument, it would be required to find the entry and subsequent search invalid because the "mere

---

[80] Def.'s Tr. Ex. 2 (original report) and Ex. 3 (supplemental report).
[81] Def.'s Ex. 2.
[82] Tr. 182, Doc. 53.
[83] *Id.*

presence of illegal drugs and weapons does not justify a protective sweep," or create exigent circumstances.[84]

Although the Defendant has put forward a strong argument, he ignores two key facts which require this Court to proceed to the exigency analysis. First, while it is true that Camallo reiterated numerous times that he entered the house because he observed guns and drugs, he also qualified this statement on numerous occasions during the hearing by stating that he entered the house because he didn't know "if there [were] any individuals in there that may [have been] armed that may be lying in wait to ambush us or might just be hiding from us."[85] Additionally, his use of the word protective sweep in the supplemental police report suggests that he went into the house to look for other individuals, not just evidence. At the hearing, he testified that when he is conducting a protective sweep, he is looking for armed individuals rather than evidence.[86]

Based on Camallo's testimony and the use of the phrase "protective sweep" in his report, the Court finds that the officers entered the trailer to make sure there were no individuals waiting to ambush them or to destroy evidence. In light of this finding, the Court must consider whether the officers' belief that they needed to enter the trailer to ensure scene and officer safety, was reasonable.

### 3. *Exigent Circumstances*

The real heart of this matter is whether exigent circumstances justified the warrantless entry into the trailer home. Even when there is probable cause to search, an officer can only search a home without a warrant when there is both probable cause and exigent circumstances.[87] Generally, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will

---

[84] *United States v. Menchaca-Castruita*, 587 F.3d 283, 294 (5th Cir. 2009).
[85] Tr. 64, Doc. 53.
[86] *Id.*
[87] *Richard*, 994 F.2d at 247-48.

be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained.[88] "Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry."[89]

In evaluating whether exigent circumstances exist, the Fifth Circuit has established that courts can look to the following non-exhaustive factors: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic ("*Rico* factors").[90]

The Court must consider the "appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of officers."[91] If the Government cannot show that the officer had a "reasonable belief that the delay necessary to obtain a warrant [would] facilitate the destruction or removal of evidence or put officers or bystanders in danger," then exigent circumstances are not present.[92]

The Government contends that exigent circumstances were present in this case because (1) the officers smelled and saw marijuana that could have been destroyed, and drug dealers usually have guns; (2) Budgewater threatened a trailer park security guard; (3) Sergent and Palmer lied about the number of people in the home which made the officers think that others were hiding

---

[88] *United States v. Mendoza-Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992).
[89] *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997).
[90] *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995).
[91] *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996) (citation omitted).
[92] *Menchaca-Castruita*, 587 F.3d at 295-96.

inside; (4) the officers saw what they thought was a gun in plain view; (5) a young man attempted to enter the trailer while the officers were guarding it; and (6) the trailer had obscured backside doors and windows that unknown individuals could have used to enter the trailer.

In response, the Defendant makes six arguments against a finding of exigent circumstances: (1) all testimony about general officer fears about drug dealers, attempts to cast a shadow of fear over the facts of this case which is unsupported by the record; (2) the Budgewater threat had been diffused because he had been detained and secured outside the residence before the officers entered; (3) Sergent and Palmer did not lie to the officers, and, even if they had, it was unreasonable for officers to enter the trailer based on a concern for officer safety; (4) the pellet gun did not present a safety risk to the officers because the officers did not immediately act on the observation of the pellet gun; (5) officers' concerns about maintaining control of the crowd *outside* of the home should have no bearing on the analysis of whether exigent circumstances existed which necessitated entering the trailer; and (6) the existence of windows and doors on the opposite side of the trailer did not create a threat to officer security such that a reasonable officer would believe that an immediate entrance to the trailer was required.

The Court examines each of these alleged exigent circumstances to determine whether a concern for officer safety justified entry into the home without a warrant. Subsumed in this discussion is an analysis of the *Rico* factors.[93] The Court's goal in viewing all of these facts is to determine whether it was reasonable for officers to believe that an individual remained inside the

---

[93] *See United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997) (noting that a proper way to conduct an exigency analysis is by examining "the evidentiary basis for each of [the] alleged exigent circumstances to get a better picture of the reasons that justified entering [defendant's] home without a search warrant.").

house who posed a danger to officers/bystanders or who was likely to destroy or remove evidence.[94]

    a)    *(Fact 1) The Generalized Concerns About Drug-Dealers Did Not Justify Entry Into the Trailer Because There was No Evidence Introduced That Officers Had a Reasonable Belief that Drug-Dealing Occurred at the Trailer.*

At the hearing and in its briefs the Government argues that "narcotics dealers usually have guns, drug dealers often keep guns in readily accessible locations in stash houses, and when people use narcotics it usually results in poor judgment."[95] The Defendant argues that the Court should disregard any testimony about general fears about drug dealers, their propensity for violence, and stash houses because there was no evidence to connect these general concerns to the facts of this case.

Where there is only evidence of personal marijuana use at a residence, rather than drug trafficking, it is inappropriate for a court to consider the connection between narcotics and trafficking in its exigency analysis.[96] When the Fifth Circuit has discussed the connection between narcotics and firearms in finding that exigent circumstances justified a warrantless entry, there was specific evidence of narcotics trafficking and specific evidence that individuals remained inside the residence who were connected to the trafficking.[97] In *United States v. Howard*, the Fifth Circuit

---

[94] *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006); *Menchaca-Castruita*, 587 F.3d at 295 ("If we conclude that the officer's beliefs that suspects were about to depart with evidence were reasonable, based on his experience, knowledge, and observations at the time, then circumstances existed that justified or even required immediate action. On the other hand, if we conclude that the officer was unreasonable in believing, based on those same circumstances, that the suspects were preparing to depart with contraband, then there would have been no reasonable justification or need for the agents to engage in a warrantless search.") (internal marks omitted, quoting *Rico*, 51 F.3d at 503).

[95] Gov.'s Br. 4, Doc. 59.

[96] *See United States v. Mercadel*, 226 F.Supp.2d 810, 814-18 (E.D. La. 2002) (no discussion of the inherent danger present when officers approach a site where trafficking is occurring where the only evidence presented relating to drugs was observation and smell of marijuana); *United States v. Brown*, Civil Action No. 16-47, 2017 WL 444338, *8 (M.D. La. Jan. 31, 2017) (same).

[97] *Howard*, 106 F.3d at 72; *Rodea*, 102 F.3d at 1403, 08 (finding that exigent circumstances justified entry and search of a mobile home where officers had arranged an undercover drug purchase with accomplice, arrested accomplice, and believed that individuals remaining in home would become suspicious when accomplice did not return).

upheld a finding that exigent circumstances justified a warrantless entry into the home of a suspected drug dealer.[98] In that case, DEA agents had credible information that the defendant's house was a stash house.[99] A month later, DEA agents arrested an individual coming out of defendant's house who agreed to cooperate with the agents.[100] He advised the agents that the defendant was storing drugs in the house and that the defendant expected him to return to the house with a kilogram of cocaine.[101] The court held that even though there was no evidence that the defendant posed a specific threat to officers, the warrantless entry into his house was justified based on officer safety because of the fact that drug traffickers often possess and use guns.[102]

Unlike *Howard*, the officers in this case had no reason to think the mobile home was a stash house or that drug dealers remained inside the mobile home. The officers were not conducting surveillance on the house for drugs nor did they have any evidence that the mobile home was used to store drugs. While the officers in *Howard* had a reasonable fear for their safety based on the belief that drug dealers often carry and use guns, the officers in this case had no reason to believe the mobile home was inhabited by a drug dealer with a propensity for violence. Accordingly, the Court is unpersuaded that a warrantless entry was justified based on general fears about drug dealers and firearms.

---

[98] *Howard*, 106 F.3d at 73.
[99] *Id.* at 72.
[100] *Id.*
[101] *Id.*
[102] *Id.* at 75.

b)    *(Facts 2, 3, and 4) The Testimony with a Factual Connection to the Record Cannot Justify the Warrantless Entry Because the Threat from Budgewater Had Been Neutralized, All of the Residents Were Detained Outside of the Trailer, and There Was No Other Evidence that Others Remained Inside.*

The Government's next assertion is that the verbal altercation between Budgewater and the security guards created a safety situation that required the officers to enter the house without a warrant.[103] The Defendant argues that this altercation did not create an exigency, and, even if it did, the exigency posed by Budgewater's threat ceased by the time officers decided to enter the mobile home because Budgewater and all of the individuals had been removed from the trailer and were detained.

While it was surely reasonable for the officers to believe that the security guard, Hanson, had been threatened by Budgewater after receiving a dispatch that Budgewater told Hanson "I have a house full of guns, and I'm not afraid to use them," this exigency evaporated once the officers detained Budgewater.

Where the potential threat to the officers evaporates before the officers search a house, they cannot use that extinguished threat to justify entry into a home.[104] For instance, in *United States v. Menchaca-Castruita*, the Fifth Circuit held that exigent circumstances were not present.[105] After catching her tenant with several large bundles of marijuana, a landlord said she was going to call the police.[106] The tenant begged the landlord not to call the police.[107] After the landlord refused and insisted that she needed to notify the police of the marijuana, the tenant attacked the landlord with a tire iron and then fled the scene.[108] The court held that while the tenant may have posed a

---

[103] Gov. Br. 3, 5, Doc. 59.
[104] *See Menchaca-Castruita*, 587 F.3d at 295.
[105] *Id.* at 296.
[106] *Id.* at 286.
[107] *Id.*
[108] *Id.*

threat when, prior to the officer's arrival, he had attempted to assault his landlord, any potential threat to the officer by the tenant "had evaporated" before the officer searched the house because the tenant had fled the scene.[109] In support of its holding, the court thoroughly examined a Tenth Circuit case that held that "officers *within* the home of an arrestee may be particularly vulnerable to a dangerous confederate out of sight within the home...[however,] the risk is substantially diminished when the officers effect the arrest outside the home."[110]

Here, the altercation between Budgewater and Hanson may have heightened the officers' senses when they initially arrived at the scene, but the threat posed by Budgewater evaporated when he was detained and handcuffed. Just as the threat had dissipated in *Menchaca-Castruita*, the threat posed by Budgewater had dissipated because he met officers outside the trailer and they immediately detained him. Although Camallo could not say with certainty that he knew Budgewater was the individual who was involved in the earlier altercation, Passman testified that the officers "figured that was him."[111] Camallo testified that Budgewater was detained and was no longer a threat to anyone.[112]

The Government appears to argue that because the officers were not certain that Budgewater was the individual who had been fighting with Hanson, it was reasonable for the officers to believe that the individual who made the threat to Hanson was still inside the mobile home. While this may be true, this argument ignores the fact that all of the individuals had been removed from the home and detained prior to the search of the home.[113] Like *Menchaca-Castruita,* where the threatening tenant was no longer in the home and there was only the "mere possibility"

---

[109] *Id.* at 295.
[110] *Id.* (emphasis added and quoting *United States v. Carter*, 360 F.3d 1235, 1238 (10th Cir. 2004)).
[111] Tr. 132:20-22, Doc. 53.
[112] *Id.* at 88.
[113] *Id.* at 71, 91-95.

that others remained inside, in this case, there were no exigent circumstances to justify entry into the home because the threat posed by the individual who had harassed Hanson was neutralized when all of the individuals were detained outside the home. Accordingly, while the original altercation heightened the officers' senses about the potential for violence when they first arrived at the trailer, the scene itself became less chaotic when all of the individuals were secured *outside* of the home.

The Government contends that the original threat is still part of the exigency calculus because the officers thought that other individuals remained inside the home based on the fact that the residents allegedly lied about the number of people inside. The primary factual dispute in this case is whether Sergent and Palmer lied to the officers about the number of individuals in the house. The lie is crucial to the exigency analysis because, beyond this lie, the officers cited no other articulable reason to believe that *another* individual was hiding inside the house. While a house full of guns and drugs may be a necessary prerequisite to entering a home without a warrant, that entry can only be justified if the officers have a reasonable belief that there is an individual inside the home who can use the guns or destroy the drugs.[114] Absent an individual inside the home, the guns are not dangerous nor is there a risk that the contraband will be destroyed.

---

[114] *Menchaca-Castruita*, 587 F.3d at 295-96 ("A finding of exigent circumstances, however, must be based on more than a mere possibility; it must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction or removal of evidence or put officers or bystanders in danger."); *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("This Court has consistently held that the presence of a firearm alone does not create an exigency without reason to believe that a suspect is aware of police surveillance."); *Harris v. O'Hare*, 770 F.3d 224, 236 (2d Cir. 2014) ("Mere suspicion or probable cause for belief of the presence of a firearm does not, on its own, *create* urgency."); *Carter*, 360 F.3d at 1241 ("There was simply no evidence that destruction of evidence was likely. Indeed, the government points to no reason to believe that other people were in the garage, or even the house. All indications were to the contrary. Defendant and his friend charged out of the garage. Defendant's mother and her boyfriend came out of the house shortly thereafter. Who was left to tamper with evidence?"); *United States v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001) ("On the instant facts, no legal exigency excused the police's entry into Haddix's home. The police could not have been in hot pursuit because they did not know if any individual was even present at the scene before Haddix's arrest; therefore, it was impossible to ascertain whether anyone was fleeing. Similarly, the police could not have perceived a serious threat to their safety; although they saw a gun on the porch, they concede that the weapon was not attended by a person who could have used it. And even if the police assumed that drugs were being destroyed inside the house based on what they saw outside it, we have previously recognized that such a belief

Where there is merely the possibility that an individual remains in the home, exigent circumstances will usually not be present.[115] On the other hand, when the Government makes a showing that "agents had actual knowledge of other persons inside a residence, a finding of exigent circumstances will be upheld."[116] "In the absence of actual knowledge, exigency may be demonstrated by showing that agents heard or saw movement that suggested the presence of other persons in the residence."[117]

does not alone make a search permissible. Notwithstanding the ease in which narcotics can be destroyed, a warrantless entry into the home of a suspected drug trafficker, effected without an objectively reasonable basis for concluding that the destruction of evidence is imminent, does not pass constitutional muster."); *United States v. Gooch*, 6 F.3d 673, 680 (9th Cir. 1993) ("The presence of a firearm alone is not an exigent circumstance. The cases cited by the government involved circumstances where unsupervised children would be left inside the house with the weapon or explosives if the officer did not secure it. In the instant case, no one remained in the tent at the time of the search. It would not have been difficult to prevent children or anyone else from entering the tent until a warrant was obtained. The government's argument logically would authorize any warrantless search where officers had reason to believe a firearm was involved.");

[115] *Menchaca-Castruita*, 587 F.3d at 295-6; *United States v. Glover*, Civil Action No. 11-290, 2012 WL 3548039, *4 (E.D. La. Aug. 16, 2012) ("But in order to demonstrate exigent circumstances, the Government must point to more than a mere possibility of the presence of persons in a residence…In this case, however, agents monitored Glover's residence from the time the drug courier arrived to the time the agents entered the residence. In that time, no one entered the home who did not subsequently leave. During the agents' conversation with Brasseaux, in which they perceived her to be 'evasive' and 'not forthcoming' about her whereabouts immediately preceding the stop, she gave no indication that others were inside the 6811 Fleur De Lis residence. Further, the Government has presented no evidence that the surveilling agents saw lights, heard movement, or noticed anything else to indicate that others might have remained in the residence."); *United States v. Neal*, Civil Action No. 11-28, 2011 WL 4527363, *4 (E.D. La. Sept. 28, 2011) ("The Government argues that the agents had a reasonable suspicion that a person in the residence could have presented a threat to the officers' safety or destroyed evidence. In support, the Government directs the Court to evidence of drugs and weapons in the residence and surveillance cameras outside the residence. It contends that the cameras could have alerted persons inside to the presence of officers outside. In order to show exigent circumstances, though, the Government must point to more than a mere possibility of the presence of persons in a residence…Here, agents did not reach defendant's residence until after they placed defendant in custody. Agents monitored defendant's residence for approximately thirty to forty minutes before they executed the protective sweep, but the only person who left the residence in that time was Knapper. Further, according to Detective Barteet, Knapper told agents only about drugs and weapons; she told agents that no one else was in the residence. Finally, the Government presented no evidence that the agents saw lights, heard movement, or saw anything else to indicate the possibility of other persons in the residence. Nor was there any evidence that defendant sold drugs with others, or was in a position to warn anyone in the house once he was detained.)

[116] *Id.* at *4; *United States v. Riley*, 968 F.2d 422, 425 (5th Cir. 1992) (warrantless entry was justified when accomplice told officers that "there was a large some of money, a handgun and another individual at the residence he had just left."); *Howard*, 106 F.3d at 76 (exigent circumstances were present where officers were certain drug dealer remained inside home and it was likely he would become aware of police surveillance).

[117] *Neal*, 2011 WL 4527363 at *4; *United States v. Ibarra-Zelaya*, 465 F.3d 596, 605 (5th Cir. 2006) (warrantless entry was justified where officer heard "multiple people moving around inside the apartment" and observed "several people fleeing the apartment via the balcony."); *Newman*, 472 F.3d at 238 (finding exigent circumstances were present when an individual fled from a home and officers saw movement from behind a curtain).

Before turning to the facts of this case, the Court must resolve the factual dispute between the Defendant and the officers. Based on the testimony and the evidence, the Court finds Sergent and Palmer's testimony credible that they did not lie about the number of people in the trailer home. The Court finds that this lie did not occur for two main reasons.

First, contemporaneous written records are generally more reliable than testimony that occurs later in time.[118] At the hearing, Camallo testified that his police reports should be accurate. He tries to "put as much information," in there as he can because he often refers back to his reports before he testifies to make sure that his testimony is accurate.[119] The Court finds it suspicious that there was no discussion of this lie or of a belief that there were other individuals in the trailer in either his initial or his supplemental report. Moreover, the fact that this lie was discussed after the Defendant raised the warrantless entry as an issue in this case further makes the purported lie suspicious.

Second, the Court credits Sergent's testimony because of his demonstrated willingness to be cooperative and truthful with the officers on the scene, even to his detriment. It is undisputed that at the scene, Sergent admitted that he made the explosive devices, even detailing how he made them. The Court finds that it would be inconsistent for Sergent to lie to the police about the number of individuals in the house, a seemingly irrelevant fact in the greater scheme of the whole encounter, when he was simultaneously willing to admit making the explosive devices, a statement clearly against his interest.

Having found that the lie did not occur, the Court finds the officers' belief—that there were others in the trailer who could have become violent with officers or who could have destroyed

---

[118] *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1119 (9th Cir. 2003) ("[R]eports made contemporaneously…are generally more reliable than those reports made later in time."); *See Bruce v. Estelle*, 536 F.2d 1051, 1057 (5th Cir. 1976).

[119] Tr. 80, 96-98, Doc. 53.

evidence—was unreasonable. Before they entered the trailer, all of the individuals who the officers had observed inside the trailer had cooperated with the officers, exited the trailer, and were detained.[120] After all three individuals were outside, neither officer heard any sounds consistent with someone inside the trailer, nor did they see any movements consistent with an individual being inside the trailer. Both officers admitted that other than the alleged lie, they had no other evidence that others remained inside the trailer.[121]

Having found that this lie did not occur and it was unreasonable for the officers to believe that others remained inside the trailer home, the Court also finds that the mere presence of the pellet gun, even if the officers believed it was a real weapon, did not create an exigent circumstance that justified their entry. The Fifth Circuit has "consistently held that the presence of a firearm alone does not create an exigency without reason to believe that a suspect is aware of police surveillance."[122]

However, the presence of a firearm justifies a warrantless entry when an occupant of a residence is close to a firearm, and the officer has a reasonable belief that the occupant may use the firearm.[123] In *United States v. Jones*, an officer approached a residence, knocked, and announced his presence.[124] The defendant opened the door, and the officers saw a handgun on a kitchen table.[125] Another man sat on a couch that was close to the table.[126] After a few seconds of

---

[120] *Id.* at 163.
[121] *Id.* at 111 (Q: You have no evidence that there was someone else in the trailer? A: Other than them lying about there being other occupants, no.); 164-65 (Q: You have no specific evidence of another person in the house, right? A: No, Not at this time…Q: You had no intel that there was another person hiding out in there, right? A: We had our suspicion. Q: You just had suspicion, right? A: Yes).
[122] *Jones*, 239 F.3d at 720; *Mechaca-Castruita*, 587 F.3d at 294; *United States v. Washington*, 340 F.3d 222, 227 (5th Cir. 2003); *United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986) ("Our past opinions have consistently emphasized that without reason to believe that a criminal suspect was aware of police surveillance, the mere presence of firearms or destructible, incriminating evidence does not create exigent circumstances.").
[123] *Jones*, 239 F.3d at 720; *United States v. Smith,* 155 Fed. App'x 747, 50 (5th Cir. 2005).
[124] *Id.* at 719.
[125] *Id.*
[126] *Id.*

talking with the defendant, the officer entered the apartment and secured the gun.[127] The court held that exigent circumstances were present because the gun presented an obvious safety risk where the individuals were within reaching distance of the gun.[128]

*United States v. Smith* stands for the same proposition.[129] In that case, a female opened a door to a hotel room.[130] Through the open door, the officers saw what they thought was a gun (which later turned out to be a decorative cigarette lighter) and some marijuana on a table.[131]After seeing what they thought was a gun, the female began yelling out to the defendant.[132] Fearing that the male defendant might pose a danger, the officers rushed into the hotel room to secure the gun.[133] The court held that exigent circumstances justified the entry.[134]

Here, the pellet gun cannot justify entry into the trailer for two reasons. First, unlike *Jones* and *Smith*, where officers entered the residences immediately to secure the weapons, the officers in this case did not enter the residence immediately. Instead, the officers, after seeing the gun, allowed Sergent, Palmer, and Keonta to walk past the pellet gun and exit the trailer. This supports a finding that officer safety did not justify the warrantless entry because the entry only occurred after all of the occupants had exited and when there was no one left in the trailer to use the gun. Second, Sergent told the officers that the item that they observed was not a real gun but a pellet gun.[135] They were aware of this before they conducted the warrantless entry which further undercuts the argument that officer safety justified the entry.

---

[127] *Id.*
[128] *Id.* at 720
[129] 155 Fed. App'x at 749.
[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] *Id.* at 750
[135] Tr. 44-45, Doc. 53 (Q: Did one of the subjects while you all were outside the trailer tell you that the gun was a pellet gun? A: I think as we were getting them out, I began to *mirandize* them, I believe it was mentioned that yes, that was just a pellet gun.").

Accordingly, the Court finds that exigent circumstances did not justify entry into the trailer because it was unreasonable for the officers to believe that other individuals remained inside who might have posed a threat to scene safety, and the threat posed by Budgewater had been neutralized before officers entered the trailer.

        c)      *(Facts 5 and 6) The Agitated Individual Cannot Justify Entry Into the Trailer Because it was Unreasonable for Officers to Believe this Individual Could Have Snuck Into the Trailer While Seven to Eight Officers Maintained the Scene.*

The Government asserts that two other circumstances created the exigency that justified the warrantless entry. The Government argues that a male attempted to physically barge past the officers to get into the trailer, and they could not track him after he left the scene. The Government claims that this attempt, combined with the fact that the trailer had obscured backside doors and windows which the officers could not see, created an urgency to enter the trailer.

In opposition, the Defendant argues that these circumstances did not create an emergency situation because the altercation occurred outside and therefore had no connection to whether it was necessary for the officers to enter the trailer. For the following reasons, the Court agrees with the Defendant.

Initially, the Court finds that the record reflects that the mobile home was monitored in such a way that if an individual had tried to enter the home through the backside doors or windows, the officers would have noticed. There were seven to eight officers on the scene, monitoring a fairly small mobile home. The evidence also suggests that the officers had secured the scene such that they could have stopped any individual who tried to enter the home through the backside door. Moreover, even if the officers were not stationed at the backside of the trailer, "[t]he happenstance that the police are unable to completely cover a residence does not, without more, support a

reasonable belief that others are inside justifying a warrantless entry."[136] The Government focuses on the individual who tried to enter the trailer in conjunction with the trailer's obscured windows, to argue that it was reasonable for the officers to think that some unknown individual snuck past all seven officers, entered the trailer, and armed himself. The Court is unpersuaded by this argument. The Government cannot rely on this unlikely hypothetical to justify the warrantless entry. Had the officers heard someone inside the trailer or someone attempting to enter the back door—which they did not—this would be a different case.

Second, while the individual was hostile and cursed at officers, this altercation happened outside the trailer. The law is clear that where a threatening individual flees a scene, that individual cannot justify entry into a home.[137] Moreover, by going inside the trailer while a crowd was gathering outside, "the officers increased the potential danger to themselves and bystanders when they proceeded to enter the residence."[138]

Accordingly, the Court finds that the hostile acts of this individual and the obscured backside windows of the trailers did not create an emergency or exigent circumstances that justified the warrantless entry into the home.

> d) *The Scene was Secured and The Officers Could Have Obtained a Warrant in Thirty Minutes.*

Considering the totality of the circumstances—the initial threat, the smell of marijuana, the observation of a pellet gun, the removal of all of the occupants, and the presence of a hostile individual in the crowd—the Court finds that the warrantless entry was not justified by exigent circumstances.

> [I]t bears emphasis that the exigent-circumstances exception is just that—an exception. There will always be some *possibility* that an unknown person might be hiding

---

[136] *United States v. Anderson*, 981 F.2d 1560, 1568 (10th Cir. 1992).
[137] *See Menchaca-Castruita*, 587 F.3d at 295.
[138] *Id.*

somewhere inside a residence, waiting for an opportunity to attack law enforcement officers or to destroy evidence. A finding of exigent circumstances, however, must be based on more than a mere possibility; it must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction or removal of evidence or put officers or bystanders in danger.[139]

One of the officers testified that they could have obtained a warrant within thirty minutes.[140] With seven to eight officers on the scene, the Court finds that the officers were in a position to wait at the scene while requesting a warrant, a plan of action which would have been far safer than sending half the officers inside the trailer with no reliable evidence that others remained inside. Having found that there was no lie about the number of people inside the trailer and that the officers had sufficiently secured the trailer, the Court finds that the officers lacked any justification for entering the trailer without a warrant. As previously discussed, the Government cannot use remote possibilities to justify warrantless entries. Accordingly, the Court finds that the entry into the trailer was not justified based on exigent circumstances as the officers were unreasonable in concluding that other people remained inside.

**B.      The Protective Sweep**

The Defendant argues that all of the evidence should be suppressed because the protective sweep was illegal as it was more akin to a full search for evidence rather than a "quick and limited" search conducted to locate dangerous individuals.

"The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of [a] premises for the safety of the agents and others present at the scene."[141] "A protective sweep of a house is legal if: (1) the government agents have a legitimate law enforcement purpose for being in the house; (2) the sweep is supported by a reasonable,

---

[139] *Id.*
[140] Tr. 139, Doc. 53.
[141] *United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005).

articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the sweep is no more than a cursory inspection of those spaces where a person may be found; and (4) the sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and lasts no longer than the police are justified in remaining on the premises."[142]

The Government cannot meet their burden on the first two elements because the Court has already determined that there were neither exigent circumstances to justify the warrantless entry nor was there a reasonable suspicion that there were other individuals inside the trailer.

### C.    The Plain View Doctrine

The other primary dispute in this case is whether the officers lawfully seized the explosive devices under the plain view doctrine. The Court finds that even if exigent circumstances justified the entry and even if the protective sweep was lawful, the seizure of the explosive devices was unlawful as their incriminating nature was not "immediately apparent."

Before turning to the legal test, the Court must address another important factual dispute. Sergent testified at the hearing that the explosive devices were located inside a hunting box in the closet in the bedroom that Passman was searching.[143] In addition to this hunting box being in the closet, he testified that there was also a hunting bag and a large tent.[144] He further testified that the hunting box was closed.[145] Passman, on the other hand, testified that he found this hunting box in the middle of the room, set on some rolled up carpet, and that it was open.[146] The Court assumes for purposes of this discussion, without deciding, that the box was open and found in the middle of the room.[147]

---

[142] *Id.* (internal quotation marks and citation omitted).
[143] Tr. 203, Doc. 53.
[144] *Id.*
[145] *Id.*
[146] *Id.* at 169.
[147] There was no mention of the fact that the box was found open and in plain view in the initial police report. Def. Tr. Ex. 2. In the supplemental report, however, Camallo noted that the items were found in an open box in the middle of

While the Fourth Amendment generally prohibits warrantless seizures, the plain view doctrine allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was "immediately apparent;" and (4) the police had lawful access to the item.[148]

The Court has already determined that the initial entry was unlawful, therefore it need not address whether the officers were justified in seizing the explosive devices based on the plain view doctrine. Nevertheless, the Court assumes that the officers were lawfully in the bedroom where the explosives were found, in order to address the Defendant's plain view argument. The Defendant focuses on the third prong, arguing that the seizure of the explosive devices was illegal because the incriminating nature of the devices was not immediately apparent.

Before turning to the facts, the Court must address a legal dispute between the parties. The Government argues that "the legality of the seizure of an item found in plain view is determined through an objective analysis of the seizure, not the subjective view of the officers present…Thus, when courts analyze a plain view seizure, an objective analysis is used to determine whether or not the incriminating nature of the contraband is immediately apparent."[149] The Defendant disagrees with the way the Government phrases the legal test, and asserts that there is a subjective component to the immediately apparent analysis: "[T]he inquiry is focused on what facts the officers who seized the evidence knew, or did not know, at the time of the seizure."[150] The reason the Government argues for an objective test is because at the hearing, Passman, the officer who found the explosive devices, could not articulate why these devices were evidence of a crime.

the room. Def. Tr. Ex. 3. ("The items were located on an opened black rifle style plastic case that was laying on a pile of rolled up carpet, apparently ripped up from the floors of the trailer. Also on the opened rifle case were several sandwich style ziplock bags filled with rice and wrapped in electrical tape, as well as several glass and plastic jars filled with rice. Two rolls of fishing string and bobbers were also observed on the makeshift table as well.").

[148] *United States v. Roberts*, 612 F.3d 306, 312 (5th Cir. 2010).

[149] Gov.'s Br. 4, Doc. 61.

[150] Def.'s Br. 6, Doc. 60.

Passman testified that he picked them up because "they…looked suspicious to me…just whatever it was being wrapped up in electrical tape."[151]

No Fifth Circuit case has directly addressed whether the immediately apparent test is an objective or a subjective inquiry. The Court finds that the proper test is an objective inquiry, but a court can only reach a conclusion about whether the incriminating nature of an item is immediately apparent by focusing on what facts the officers who seized the evidence knew, or did not know, at the time of the seizure. In some sense then, the parties appear to agree about the proper test to be applied.

"The incriminating nature of an item is immediately apparent if the officers have probable cause to believe that the item is either evidence of a crime or contraband."[152] If an officer only has reasonable suspicion that the item is evidence of a crime, then he does not have probable cause.[153] Probable cause to seize an item in plain view exists whenever the facts available to the searching officer support a reasonable belief that the item may be contraband, stolen property, or evidence of a crime.[154] The Connecticut Supreme Court has neatly described how the incriminating nature test is an objective test: "In light of this objective standard we need only look to the evidence presented relating to [the officer's] knowledge and to determine whether, on the basis of that knowledge, a reasonable person would have had probable cause to believe that the green, leafy substance contained in the clear plastic bag in the cigar box in the defendant's locked bedroom was marijuana."[155]

---

[151] Tr. 175, Doc. 53.
[152] *United States v. Waldrop*, 404 F.3d 365, 369 (5th Cir. 2005) (quotation marks and citation omitted).
[153] *United States v. Rodriguez*, 601 F.3d 402, 407 (5th Cir. 2010); *United States v. Byrd*, 211 F.3d 1270, *3 (6th Cir. 2000) (finding that "when an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating.").
[154] *Texas v. Brown*, 460 U.S. 730, 742 (1983).
[155] *State v. Eady*, 733 A.2d 112, 118-19 (Ct. 1999).

A case cited by the Government, *United States v. Messino*, helpfully applies this test.[156] In that case, the question was whether it was lawful for an officer to seize a rolodex that was in plain view.[157] Although the court found "no controlling precedent as to the objectivity of the immediate apparency requirement itself," it found that "controlling cases discussing the objectivity of the Fourth Amendment reasonableness inquiry in general are read naturally" to apply to the immediate apparency requirement.[158] At an evidentiary hearing, the officer testified that when he looked at the rolodex, he did not see anything immediately incriminating about it, and he did not know, just from looking at it, that the rolodex contained helpful financial leads for his investigation.[159] Despite the officer's testimony that subjectively he did not think the incriminating nature of the rolodex was immediately apparent, the court found that "objectively speaking, the *facts known to the officer* provided probable cause" to seize the rolodex.[160] The court found that the officer had been investigating the defendant for two years, knew that he was involved in large-scale narcotics trafficking, knew that in a rolodex a person normally keeps oft-used names, and that "a narcotic dealers' oft-used names, addresses and phone numbers are likely to be incriminating evidence."[161] Further, the court held that "the fact that an item is a Rolodex is easily determined from a quick glance at the item, [and], [t]herefore, based on facts known to the [officer,] he had probable cause to believe that the Rolodex, which was in his plain view, was incriminating evidence."[162]

The Court finds this case helpful in that it neatly separates which inquiries are objective and which are subjective. While the subjective belief of an officer that he does not have probable cause to seize an item (or that it is not immediately incriminating) is not dispositive of the issue,

---

[156] *United States v. Messino*, 871 F.Supp. 1035, 1040 (N.D. Ill. 1995).
[157] *Id.* at 1040.
[158] *Id.* at 1039.
[159] *Id.* at 1041.
[160] *Id.*
[161] *Id.*
[162] *Id.*

the court must look to the facts known to the searching officer at the time of the seizure, and in this sense, the inquiry has a subjective tinge.

In this case, the Government argues that the devices were evidence of three different crimes—(1) possession of a dangerous weapon in furtherance of drug distribution[163]; (2) illegal distribution of prescription drugs[164]; and (3) possession of explosives without a license.[165] The Court finds that the incriminating nature of the devices was not immediately apparent because Passman had to manipulate the objects to find that they were explosives built out of pill bottles.

A seizure is unlawful if an officer must manipulate an object to determine whether it is evidence of a crime; instead it must be immediately apparent that the object is evidence of a crime.[166] A useful illustration of this rule is provided by the *Messino* case discussed above.[167] In addition to seizing a rolodex, the officer also picked up a book that he found inside of a desk that he thought was related to income tax crimes that he was investigating.[168] The court found that the officer lacked probable cause to seize the book: "The court finds [the officer] only would have had probable cause to seize the Police Book once he determined that is what it was. What is problematic is whether [the officer] saw the item was a Police Book using his plain view, or he instead made

---

[163] La. Rev. Stat. Ann. § 14:95(E) (2017).

[164] La. Rev. Stat. Ann. § 40:966 (2017).

[165] La. Rev. Stat. Ann. § 40:1472.4 (2017).

[166] *Arizona v. Hicks*, 480 U.S. 321, 325 (1987) ("But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry. This is why…the distinction between looking at a suspicious object in plain view and moving it even a few inches is much more than trivial for purposes of the Fourth Amendment."); *United States v. Stanley*, 351 Fed. App'x 69, 73 (6th Cir. 2009) ("Officers may not manipulate an object to determine whether it is contraband; instead, it must be immediately apparent that the object is contraband."); *United States v. Bourne*, Civil Action No. 08-88, 2011 WL 4458846, *7 (E.D.N.Y. Sep. 23, 2011) ("Here, Agent Goldstein's testimony—in conjunction with the photographs that he took of the interior of Alleyne's residence—provides a sufficient basis for finding that the three seized documents, and other evidence referenced in the search warrant application, were in plain view. Agent Goldstein credibly testified that the documents were legible as they lay, and that *he did not touch or manipulate items within Alleyne's home*. The incriminating nature of these documents were immediately apparent to him, based on his law enforcement experience and his knowledge of this case.) (emphasis added).

[167] *Messino*, 871 F.Supp. at 1042.

[168] *Id.*

this determination after an *Arizona v. Hicks* -type illegal extension of the view into a search. The court finds that [the officer] only determined, and only could have reasonably determined based upon facts known to him, that Exhibit 3 was a Police Book after picking it up and examining it; that determination was not made in his plain view observation."[169]

Just as the officer did not have probable cause to seize the book in *Messino* because he could not tell what it was until after he manipulated it, examined it, and opened it up, Passman did not have probable cause to seize the devices because he only determined, and only could have reasonably determined, that the devices were explosives after he picked it up, shook it, and examined them further.

At the hearing, Passman testified that after determining there were no individuals hiding in the bedroom, he walked back to the middle of the room and saw what appeared to be a black hunting case.[170] He had a flashlight but it was malfunctioning, and the light did not work in the room.[171] After approaching the case, he observed a knife, scope, ammunition, bags of rice, and a few cylinders wrapped in electrical tape.[172] Passman testified repeatedly that he picked up the cylinders because of "just not knowing what it was."[173] After he picked it up, he said he still did not notice anything about the device because it was "still kind of dark and the light was kind of messing up."[174] Next, he shook it, heard BBs, and at that point, he testified that he knew "that it wasn't good."[175] He got his flashlight to work, and then he saw a fuse on the top of the device.[176]

---

[169] *Id.*
[170] Tr. 145, Doc. 53.
[171] *Id.*
[172] *Id.*
[173] *Id.* at 147; *Id.* at 151 (Q: What made you pick up the explosive device? A: Just basically to see what it was."); *Id.* at 168 ("Q…[Y]ou weren't sure what it was so you picked it up and shook it? A: Unfortunately, yes."); *Id.* at 170 ("Q: What did you think it was when you saw it at first? A: Honestly, I had no idea to be honest with you.").
[174] *Id.* at 147.
[175] *Id.* at 147, 172.
[176] *Id.*

In light of the fact that this is an objective standard, the Court need only look to the evidence presented relating to Passman's knowledge before he picked up the objects to determine whether, on the basis of that knowledge, a reasonable officer would have had probable cause to believe that cylindrical items wrapped in tape were evidence of some crime. Here, the Court finds that, based on the facts known to the officer before he picked it up and began manipulating it, a reasonable officer would not have had probable cause to believe that the devices were evidence of possession of a weapon in furtherance of a drug crime, possession of an unregistered explosive device,[177] or illegal distribution of prescription drugs. There was no indication that these devices were explosives or pill bottles just by looking at them. It was only after Passman manipulated the devices further, by shaking them and unwrapping them, that he developed some suspicion that they were explosives wrapped in pill bottles.

Accordingly, even if exigent circumstances justified entry into the home, and even if the protective sweep doctrine justified the officers' entry into the bedroom, the seizure of the devices was unlawful under the plain view doctrine.

---

[177] Additionally, even if Passman could immediately tell the devices were explosives, which this Court has held was impossible based on the facts known prior to the further shake and examination, the devices would not be evidence of the crime of possession of an explosive without a license where Passman had no knowledge of the fact that Sergent did not have a license for the devices. *See Waldrop*, 404 F.3d at 369 (finding that incriminating nature of a weapon was only immediately apparent where officers knew that defendant was a convicted felon who was prohibited by federal law from possession of a weapon).

## III.  CONCLUSION

For the reasons set forth above, the Court finds that all of the evidence and subsequent statements shall be suppressed. The warrantless entry was unlawful because there were no exigent circumstances present. Even if exigent circumstances were present, however, the Court would still suppress the evidence and statements in this case as the devices were not properly seized under the plain view doctrine. Accordingly, the Defendant's Motion (Doc. 42) is **GRANTED**.

Signed in Baton Rouge, Louisiana, on July 11, 2017.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**